**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Taylor L. Emerson, Esq. (SBN 225303)
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@bradleygrombacher.com
temerson@bradleygrombacher.com

**UNITED EMPLOYEES LAW GROUP, PC**
Walter L. Haines, Esq. (SBN 71075)
5500 Bolsa Avenue, Suite 201
Huntington Beach, California 92649
Telephone: (562) 256-1047
Fax: (562) 256-1006

Attorneys for Plaintiff, JAMES OUTLEY II

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES OUTLEY II, an individual, on his own behalf and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>TURNER CONTRACTING, INC., an Indiana Corporation<br><br>    Defendants. | **CASE NO. 5:17-CV-03465-LHK**<br><br>**CLASS ACTION**<br><br>**NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date:        November 1, 2018<br>Time:        1:30 p.m.<br>Location:    United States District Court<br>              Northern District<br>              280 South 1st Street<br>              Courtroom 8, 4th Floor<br>              San Jose, California |

## TABLE OF CONTENTS

I.    INTRODUCTION…………………………………………………………………1

II.   FACTS AND PROCEDURE……………………………………………………4

      A.  FACTS RELEVANT TO THE SUBSTANTIVE CLAIMS OF LITIGATION…..5

          1.  Overview of Defendant's Business Operation Claims...……………………5

          2.  The Wage Claims at Issue...……………………………………………..7

          3.  Facts Relevant to the Plaintiff...…………………………………………7

          4.  Plaintiff and Class Members Were Subject to Generally Applicable Policies
              and/or Practices Which Resulted in Time Worked "Off-the-Clock" …………7

          5.  Plaintiff and the Members of the Class Were Routinely Denied Legally
              Compliant Meal and Rest Break Periods………………………………………8

          6.  Derivative and Direct Wage Statement Claims ………………………………8

      B.  SUMMARY OF THE SETTLEMENT TERMS……...……………………..9

          1.  Composition of the Settlement Class……...……………………………..9

          2.  Settlement Consideration……...…………………………………………9

          3.  Formula for Calculating Settlement Payments……...……………………10

          4.  Releases by the Settlement Class……...…………………………………10

      C.  THE NOTICE AND SETTLEMENT ADMINISTRATION PROCESS WERE
          COMPLETED PURSUANT TO THE COURT'S ORDER………………………..11

      D.  ARGUMENT………………………………………………………………12

          1.  The Standard for Final Approval Has Been Met……………………………..12

i

2. The Settlement Was Achieved After Evaluating the Strengths of Plaintiff's Case and the Risks, Expense, Complexity, and Likely Duration of Further Litigation……………………………………………………………………14

A. Plaintiff's Request for Attorneys' Fees in the Amount of the Amount of Thirty Percent of the Common Fund is Fair and Reasonable……………………………5

1. Plaintiff's Request for Attorneys' Fees Should be Evaluated Under a Deferential Standard………………....………………………………………5

2. Plaintiff's Counsel's Request for Attorneys' Fees in the Amount of Thirty Percent of the Common Fund is Reasonable Under Controlling California Law Formula for Calculating Payments from the Net Settlement Amount………………………………………………………………......6

B. Plaintiff's Counsel's Request for Attorneys' Fees in the Amount of Thirty (30%) Percent of the Common Fund Is Reasonable Under Ninth Circuit Precedent………………………………………………………………………8

C. Other Factors Support Plaintiff's Counsel's Fee Request….…………………..12

1. The Results of the Litigation Support the Requested Fees...…………13

2. The Substantial Contingent Risk, Including the Risk of Further Litigation, Supports the Requested Fees.………………………………14

3. The Settlement Was Reached through Arm's-Length Bargaining in Which All Parties Were Represented by Experienced Counsel………..17

4. Class Counsel Conducted A Thorough Investigation of the Factual and Legal Issues……….………………………………………………… ..18

5. The Class Has Responded Positively to the Settlement………………..10

ii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6. The Proposed PAGA Settlement Is Reasonable………………………..20

7. The Requested Payment to the Settlement Administrator Is Reasonable

and Should Receive Final Approval……………………………………20

D. CONCLUSION…………………………………………………………………21

# **TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Amchem Products, Inc. v. Windsor*

   521 U.S. 591, 620 (1997) ................................................................................10

*Berkey Photo, Inc. v. Eastman Kodak Co.*

   603 F.2d 263 (2d Cir. 1979) ...........................................................................17

*Churchill Village, LLC v. Gen. Elec.*

   361 F.3d 566 (9th Cir. 2004) ..........................................................................19

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*

   258 F.R.D. 545, 557-58 (N.D. Ga. 2007) .......................................................11

*D'Amato v. Deutsche Bank*

   236 F.3d 78, 85 (2d Cir. 2001) .......................................................................17

*Hanlon v. Chrysler Corp.*

   150 F.3d 1011, 1020 (9th Cir. 1998) .........................................................13, 14

*Holak v. K Mart Corp.*

   2014 U.S. Dist. LEXIS 139879, at *21 (E.D. Cal. Sept. 30, 2014) ..................13, 16

*Hopson v. Hanesbrands Inc.*

Case No. 08-00844, 2009 U.S. Dist. LEXIS 33900, at *24 (N.D. Cal. Apr. 3, 2009) ...............20

*Hurst v. Buczek Enters.*, LLC

   870 F. Supp. 2d 810, 829 (N.D. Cal. May 2, 2012) .............................................16

*In re Apple Computer, Inc. Derivative Litig.*

   No. C 06-4128 JF (HRL), 2008 U.S. Dist. LEXIS 108195 (N.D. Cal. Nov. 5, 2008) ............17

iv

*In re Initial Pub. Offering Sec. Litig.*

    260 F.R.D. 81, 116 & n.308 (S.D.N.Y. 2009) ........................................................10, 11

*International Union of Operating Engineers-Employers Canst. Industry Pension, Welfare and Training Trust Funds v. Karr*

    994 F. 2d 1426, 1430 (9th Cir. 1993) ...................................................................11

*Linney v. Cellular Alaska P'ship*

    151 F.3d 1234, 1242 (9th Cir. 1998) ...................................................................17

*Matsushita Elec. Indus. Co. v. Epstein*

    516 U.S. 367 (1996) .............................................................................................11

*McKenzie v. Fed. Express Corp.*

    765 F. Supp.2d 1222, 1228-1229 (C.D. Cal. 2011) ..............................................8

*Milligan v. Am. Airlines, Inc.*

    577 Fed. Appx. 718, 719 (9th Cir. 2014) ...........................................................15

*Morgan v. United Retail, Inc.*

    186 Cal. App., 4th 1136, 1228-229 (2010) ...........................................................9

*Neary v. Regents of Univ. of Cal.*

    3 Cal. 4th 273, 277 (1992) ..................................................................................17

*Nordstrom Com. Cases*

186 Cal. App. 4th 576, 579 (2010) .................................................................16, 20

*Officers for Justice v. Civil Serv. Comm'n*

    688 F.2d 615, 625 (9th Cir. 1982) ................................................................13, 14

v

*Ogiamien v. Nordstrom, Inc.*

2015 U.S. Dist. LEXIS 22128, at *15; 165 Lab. Cas. (CCH) P36, 317 (C.D. Cal. February 24, 2015) ................................................................................................................................ 16

*Quinlan v. Macy's Corp. Servs., Inc.*

2013 U.S. Dist. LEXIS 164724 (C.D. Cal. 2013) ................................................................. 16

*Reber v. Aimco/Bethesda Holdings, Inc.*

2008 U.S. Dist. LEXIS 81790, at *25 (C.D. Cal. August 25, 2008) ...................................... 16

*Ridgeway v. Wal-Mart Stores, Inc.*

2014 U.S. Dist. LEXIS 126806, at *28-29 (N.D. Cal. Sept. 10, 2014)…….…..……………15, 16

*Rodriguez v. W. Publ'g Corp.*

563 F.3d 948, 965 (9th Cir. 2009) ................................................................................. 13, 14

*Stiller v. Costco Wholesale Corp.*

298 F.R.D. 611 (S.D. Cal. 2014) ........................................................................................ 16

*Torrisi v. Tucson Elec. Power Co.*

8 F.3d 1370, 1375 (9th Cir. 1993) ...................................................................................... 14

*Trans World Airlines, Inc. v. Hughes*

312 F. Supp. 478 (S.D.N.Y. 1970) ..................................................................................... 17

*Training Trust Funds v. Karr*

994 F. 2d 1426, 1430 (9th Cir. 1993) ................................................................................. 11

*W. Virginia v. Chas. Pfizer & Co.*

314 F. Supp. 710, 743-44 (S.D.N.Y. 1970) ........................................................................ 16

vi

**STATE CASES**

*7-Eleven Owners for Fair Franchising v. Southland Corp.*

    85 Cal. App. 4th 1135, 1152-53 (2000) .................................................................19

*Contreras v. United Food Group, LLC*

    Case No. BC389253 (L.A. County Super. Ct.) ......................................................19

*Doty v. Costco Wholesale Corp.*

    Case No. CV05-3241 FMC-JWJx (C.D. Cal. May 14, 2007) ...............................19

*Fukuchi v. Pizza Hut*

    Case No. BC302589 (L.A. County Super. Ct.) ......................................................19

*Gomez v. Amadeus Salon, Inc.*

    Case No. BC392297 (L.A. Super. Ct.) ..................................................................20

*Lim v. Victoria's Secret Stores, Inc.*

    Case No. 04CC00213 (Orange County Super. Ct.) .........................................19, 20

*Overton v. Walt Disney Co.*

    136 Cal.App.4th 263, 271, 38 Cal.Rptr.3d 693 (2006) ..........................................15

*Palencia v. 99 Cents Only Stores*

    No. 34-2010-00079619 (Sacramento County Super. Ct.) ......................................19

*Ressler v. Federated Dep't Stores, Inc.*

    Case No. BC335018 (L.A. County Super. Ct.) ......................................................19

*Sorenson v. PetSmart, Inc.*

    Case No. 2:06-CV-02674-JAM-DAD (E.D. Cal.) .................................................19

**FEDERAL STATUTES**

29 U.S.C. Sections et seq. ...................................................................................................4

**STATE STATUTES**

California Business & Professions Code Section 17200 ......................................................5

California Labor Code § 200-201 ........................................................................................4

California Labor Code §§ 226.7...........................................................................................4

California Labor Code §512 .................................................................................................4

California Labor Code Section 1174.....................................................................................5

California Labor Code Section 1194 and 510.....................................................................4, 5

California Labor Code Section 203 .......................................................................................5

California Labor Code Section 204, 223 and 1197................................................................5

California Labor Code Section 512 .......................................................................................4

**OTHER AUTHORITY**

12 CCR § 11040.....................................................................................................................4

Manual for Complex Litigation, Third (Fed. Judicial Center 1995) ("Manual") § 30.41 ...........13

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on November 1, 2018, at 1:30 p.m., in the United States District Court for the Northern District of California, San Jose, Courtroom 8, 4th Floor, located at 280 South 1st Street, Courtroom 8, 4th Floor, San Jose, CA 94102, before the Honorable Lucy H. Koh, Plaintiff James Outley, II ("Plaintiff"), will move and hereby does move for final approval of the proposed Settlement with Defendant Turner Contracting, Inc. ("Defendant" or "Turner"). Specifically, Plaintiff moves the Court pursuant to Federal Rule of Civil Procedure 23 for an order finally approving the Class Action Settlement Agreement as fair, reasonable and adequate. Defendant does not oppose the relief sought by this motion.

This Motion is based upon: (1) this Notice of Motion and Motion; (2) the Memorandum of Points and Authorities (3) the Declaration of Marcus J. Bradley; (4) the Declaration of Ani S. Sarich; (5) the Declaration of Walter Haines; (6) the [Proposed] Final Approval Order; (7) the records, pleadings, and papers filed in this action; and (8) upon such other documentary and oral evidence or argument as may be presented to the Court at or prior to the hearing of this Motion.

Dated: October 2, 2018                                    BRADLEY/GROMBACHER, LLP


BY: _____
        MARCUS J. BRADLEY
        Attorneys for Plaintiff,
        JAMES OUTLEY, II

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.    INTRODUCTION

On July 6, 2018, this Court granted preliminary approval of the Joint Stipulation of Settlement and Release of Claims[1] and approved distribution of the Notice of Class Action Settlement ("Notice of Settlement") to all Class Members.  (ECF Dkt. No. 51.)  Class Members were given 60 days to opt out or object to the Settlement ("Response Deadline").  Now that the Response Deadline has passed, Plaintiff is pleased to report that: **(1) 0 Class Members opted out of the settlement; (2) 0 Class Members objected to the Settlement; (3) the entire Net Distribution Fund will be disbursed to all 319 members of the Class; and (4) the average payment to members of the Monetary Payment Class is approximately $2,318.21, and the highest is approximately $17,556.44.** (Declaration of Ani S. Sarich ["Sarich Decl."], ¶¶ 9-10,12.)

Given that the class members in this case are primarily low wage workers, averaging $17 per hour, this recovery is an exemplary result. **At $17,556.44, some members of the class will be receiving roughly the equivalent of 6 months of pay[2].**

Plaintiff now seeks final approval of this non-reversionary Settlement with Defendant Turner Contracting, Inc. ("Defendant" or "Turner").  The basic terms of the Settlement provide for the following:

(1)    A completely non-reversionary Total Settlement Amount of $1,299,972[3].  The Total Settlement Amount includes[4]:

---

[1] Hereinafter, "Settlement" or "Settlement Agreement."  Unless indicated otherwise, all capitalized terms used herein have the same meaning as those defined by the Settlement Agreement.

[2] There are 38 class members who will receive settlement shares in excess of $5,000. There are 11 class members who will receive settlement shares in excess of $10,000. There are 4 class members who will receive the maximum settlement shares of $17,556.44.

[3] This amount includes $99,972 in payments made to class members directly by Defendant during the pendency of the litigation, but prior to mediation, in so-called "Pick-Up Stix" settlements. It should be noted that all of the recipients executed releases in exchange for their Pick-Up Stix" payments.

[4] Any amounts not awarded as attorneys' fees and costs, service award, LWDA award or claims administration expenses will be added to the amount payable to the class.

2

1    (a)    Attorneys' fees not to exceed $389,991.60.

2    (b)    Class Counsel Costs Award not to exceed $30,000.

3    (c)    Settlement Administration Costs of $18,000, to be paid to the jointly selected

4    settlement administrator, CPT Group, Inc. ("CPT").

5    (d)    A $7,500 payment to the California Labor & Workforce Development

6    Agency ("LWDA") for the LWDA's portion of the $10,000 PAGA Award

7    pursuant to the Labor Code Private Attorneys General Act of 2004

8    ("PAGA").

9    (e)    Plaintiff's Class Representative Service Award of $15,000 for his service on

10    behalf of the Class and for agreeing to a broader release than those required

11    of other Class Members.

12    (f)    A Net Settlement Value estimated to be $739,508.40[5] (i.e., the Total

13    Settlement Amount of $1,200,000.00 minus the LWDA's portion of the

14    PAGA Award ($7,500), proposed Class Counsel Fees Award ($389,991.60),

15    proposed Class Counsel Costs Award ($30,000), proposed Service Awards

16    ($15,000) and Settlement Administration Costs ($18,000)).  The entire Net

17    Settlement Value will be paid to all Class Members as there are no opt outs.

18    An objective evaluation of the Settlement confirms that the relief negotiated on the Class'

19    behalf is fair, reasonable, and adequate in light of the risks of continued litigation.  As discussed

20    below, while Plaintiff was confident that the claims were certifiable and had merit, there were

21    significant risks that the Court could deny certification and that Defendant could prevail on the

22    merits.  Accordingly, the Settlement was negotiated by the Parties at "arm's length" with helpful

23    guidance from Mark Rudy, an experienced and well-respected class action mediator.  As noted

24    above, the Settlement confers substantial monetary benefits to Class Members.   Indeed, Class

25

26

27    [5] When added to the $99,972 in previously paid "Pick-Up Stix" payments, the guaranteed Net
Settlement Value payout will be at least $839,480.40.

28

3

Counsel believes that the average net recovery is exponentially higher than many of the other wage and hour class action settlements approved by California state and federal courts.

The relief offered by the Settlement is particularly impressive when viewed against the difficulties encountered by plaintiffs pursuing wage and hour cases (*see infra*).  Indeed, by settling now rather than proceeding to trial, the Class Members will not have to wait (possibly years) for relief, nor will they have to bear the risk of class certification being denied or of Defendant prevailing at or before trial.

Accordingly, given the Settlement's favorable terms and the manner in which these terms were negotiated and received by Class Members as evidenced by no objections or opt outs, Plaintiff respectfully requests that the Court grant this Motion for Final Approval of the Settlement Agreement and retain jurisdiction to enforce the Settlement.

## II.   FACTS AND PROCEDURE

Plaintiff's First Amended Complaint sought relief on behalf of himself and the members of the class as a result of employment policies, practices and procedures more specifically described below, which violate the California <u>Labor Code</u>, and the orders and standards promulgated by the California Department of Industrial Relations, Industrial Welfare Commission, and Division of Labor Standards, and the Fair Labor Standards Act, which have resulted in the failure of Defendant to pay Plaintiff and members of the class all wages due to them as well as Defendant's violation of the California Investigative Consumer Reporting Agencies Act ("ICRAA").  Said employment policies, practices and procedures are generally described as follows:

      a. Defendant failed to provide Plaintiff and members of the class with timely meal and rest breaks (California <u>Labor Code</u> §§ 200, 226.7, 512, 12 CCR § 11040, and 29 U.S.C. §201, et. seq.);

      b. Defendant routinely failed to pay Plaintiff and members of the class correct overtime compensation (Welfare Commission Orders and California <u>Labor Code</u> §§ 510, 1194);

4

c.  Defendant routinely failed to provide Plaintiff and members of the Class one day's rest in seven in violation of California <u>Labor Code</u> sections 551 and 552;

d.  Defendant failed to pay Plaintiff and members of the class the minimum wage for all hours worked (California <u>Labor Code</u> §§ 558, 1194, 1194.2, 1197 & 1198 and Wage Order 16);

e.  Defendant failed to provide Plaintiff and members of the putative class with proper wage statements (California <u>Labor Code</u> § 226(a));

f.  Defendant failed to maintain accurate records of work performed by members of the Class in violation of California <u>Labor Code</u> section 1174, and IWC Wage Order 16, § 6;

g.  Defendant failed to pay Plaintiff and members of the putative class all final wages in a timely fashion (California <u>Labor Code</u> §§201-203);

h.  Failed to provide Plaintiff and the other members of the putative class with stand-alone written disclosures before obtaining a credit or background report in compliance with the statutory mandates; and,

i.  Failed to comply with the ICRAA.

In addition, Plaintiff and members of the class sought relief and damages for Defendant's violation, by way of the above-described conduct, of California's unfair competition laws (California <u>Business & Professions Code</u> § 17200), including the equitable remedies of declaratory relief, disgorgement, accounting, and restitution. (*See generally* FAC, ECF Dkt. No. 38-2.)

**A.    FACTS RELEVANT TO THE SUBSTANTIVE CLAIMS OF LITIGATION**

**1.    Overview of Defendant's Business Operation**

Turner is an Indiana corporation that provides the following services to its clients:

5

- Overburden Removal[6]

- Metal Contract Mining[7]

- Mine Land Reclamation[8]

- Heavy Civil Excavation

- Demolition, Landfill Excavation, Underground Utilities

The settlement class is comprised of all hourly employees employed by, or formerly employed by, Turner at any time between and including June 14, 2013, and the date of preliminary approval, excluding Reginald Sutton[9], who worked in the State of California. Such individuals held job positions which included:

- Heavy Equipment Operator;

- Dump Truck Driver;

- Truck Excavator

- Grader

- Haul Truck Driver

---

[6] In mining, overburden (also called waste or spoil) is the material that lies above an area that lends itself to economical exploitation, such as the rock, soil, and ecosystem that lies above a coal seam or ore body. In this capacity, Turner digs and hauls materials such as topsoil, clay, mud, sand, gravel, dimensional stone, and shale.

[7] Turner is involved in all facets of contract mining, from the earliest stages of exploratory test drilling to managing an around-the-clock mining fleet while running fully developed and productive mine pits. Turner mines several million tons annually across North American providing several mining services including: High Production Contract Mining (Around-the-Clock), Overburden Removal (Stripping), Green Site Mine Start-Up, Dumping/Controlling Groundwater & Stormwater, Drilling & blasting, and Erosion Control.

[8] Mine reclamation is the process of restoring land that has been mined to a natural or economically usable state. Although the process of mine reclamation occurs once mining is completed, the planning of mine reclamation activities occurs prior to a mine being permitted or started. Mine reclamation creates useful landscapes that meet a variety of goals ranging from the restoration of productive ecosystems to the creation of industrial and municipal resources.

[9] As the Court is aware, Reginald Sutton, the plaintiff in *Sutton v. Turner Contracting*, United States District Court for the Northern District of California Case No. 5:17-cv-02051, accepted a Rule 68 Offer to Compromise in the amount of $20,000. Thereafter Judgement in that case was entered by this Court on June 8, 2017. (ECF Dkt. No. 12.)

6

### 2.     The Wage Claims at Issue

The alleged uniform policies and practices at issues in this litigation can be summarized as follows (each of which are discussed in detail below):

- The employees had to attend a mandatory daily meeting before each shift that they were not paid for.

- Turner employees had to drive approximately 1.25 hours each way from Turner-required housing.

- Turner's policy was not to pay overtime unless an employee had worked more than forty (40) hours in a workweek even though each shift was 12 hours and the employees spent approximately 2.5 hours commuting round trip each day for which they received no compensation.

- Depending on the needs of the job site, Plaintiff alleges that Turner had its employees work seven (7) consecutive days in a row without a day of rest.

- Turner failed to provide legally compliant wage statements. Plaintiff alleges that the other employees also failed to receive legally compliant paystubs.

- Plaintiff and the other non-exempt Turner employees did not receive rest breaks. In addition, Plaintiff and the other non-exempt Turner employees did not receive "off-the-clock" meal breaks. The only time an employee could leave his piece of equipment was to use the restroom or at a shift change. Turner employees were required to keep the heavy equipment operating continuously throughout their shift for the mining operations.

- Plaintiff and the other non-exempt Turner employees did not receive reimbursement for expenses incurred in the discharge of their duties for Turner.

- Defendant Turner denies these allegations and gathered numerous employee Declarations supporting these denials.

### 3.     Facts Relevant to the Plaintiff

Plaintiff was employed with Defendant in Cupertino, California from approximately May

7

23, 2016 to January 20, 2017.

### 4. Plaintiff and Class Members Were Subject to Generally Applicable Policies and/or Practices Which Resulted in Time Worked "Off-the-Clock"

Plaintiff's primary claim for unpaid time is shared amongst each of Defendant's employees regardless of position or shift. Here, Plaintiff claims that Defendant required Class Members to perform pre and post-shift activities such as attending safety meetings and traveling to/from the jobsite in Defendant's company vans. Plaintiff's claim that these policies resulted in "off-the-clock" work is typical for all non-exempt employees because all non-exempt employees were allegedly subject to the same polices

### 5. Plaintiff and the Members of the Class Were Routinely Denied Legally Compliant Meal and Rest Break Periods

Similarly, the understaffing allegations which resulted in break violations (both meal and rest) were also shared amongst Plaintiff and the members of the Class. Throughout their employment, Plaintiff and the members of the class worked shifts, the duration of which entitled them to meal and/or rest breaks under California law. Yet, as a result of Defendant's alleged understaffing policies and its alleged requirement that the machinery be operational 24/7, Plaintiffs and the members of the Class claim they were denied timely and adequate break periods. Indeed, Defendant did not maintain a compliant written rest break policy and no meal periods appear in Defendant's data.

However, Defendant contends Plaintiff's direct meal and rest break claims are neither certifiable for class treatment nor meritorious.

### 6. Derivative and Direct Wage Statement Claim

Plaintiff also seeks redress based upon Defendant's wage statements. Specifically, Plaintiff alleges that Defendant's failed to make wage statements available to members of the Class. In the course of discovery, Defendant did produce some exemplar wage statements, however, Plaintiff alleges that such statements were still not compliant because they failed to list all hours worked. See *McKenzie v. Fed. Express*

8

*Corp.*, 765 F. Supp.2d 1222, 1228-1229 (C.D. Cal. 2011) (granting summary judgment on Plaintiff's PAGA wage statement claim upon finding that Fed-Ex's paystubs violated Section 226(a)(2) by failing to list total hours worked and listing several overtime entries that when aggregated with other entries did not accurately reflect the total hours worked, and distinguishing the case from *Morgan v. United Retail, Inc*., 186 Cal. App., 4th 1136, 1228-229 (2010), wherein employees could readily determine the correct total hours worked from the information listed in the wage statements).

### B.    SUMMARY OF THE SETTLEMENT TERMS

#### 1.    Composition of the Settlement Class

The Settlement Class consists of "all non-exempt employees who were employed by Defendant in California at any time between June 14, 2013 and final approval of the Settlement Agreement." (Settlement Agreement at ¶ 1.25.)

#### 2.    Settlement Consideration

Plaintiff and Defendant have agreed to settle all class claims and representative claims alleged in the Actions in exchange for the Total Settlement Amount of $1,299,972. The Total Settlement Amount includes: (1) settlement payments to participating Monetary Payment Class members; (2) a requested thirty (30) percent of the Total Settlement Amount or $389,991.60 in attorneys' fees and up to $30,000 in litigation costs/expenses to Class Counsel; (3) $10,000 allocated to settle PAGA claims of which a $7,500 payment will be made to the LWDA to account for the LWDA's portion of the PAGA Award; (4) Settlement Administration Costs of approximately $18,000; and (5) a requested Service Award of up to $15,000 to James Outley II. (Settlement Agreement at ¶¶ 1.2, 1.3, 3.4, 3.5. attached to Bradley Decl. ECF Dkt No. 41). Based on the above, the Net Settlement Value is estimated to be $839,480.40.[10]

Subject to the Court approving Attorneys' Fees and Costs, the payment to the LWDA, Settlement Administration Costs, and the Plaintiff's Service Award, the Net Distribution Fund will be distributed to all Participating Class Members. **Because the Class Settlement Amount is non-reversionary, 100% of the**

---

[10] Any amounts not awarded as attorneys' fees and costs, service award, LWDA award or claims administration expenses will be added to the amount payable to the class.

**Net Settlement Value will be paid to Participating Class Members, and without the need to a submit claim for payment**.[11]   (Bradley Decl., Ex 1, Settlement Agreement at ¶¶ 2.3., ECF Dkt No. 41)  In addition, employer-side taxes will be paid by Defendant in addition to the Total Settlement Amount.  (Settlement Agreement at ¶ 3.8(B).)

### 3.     Formula for Calculating Settlement Payments

The Net Settlement Value shall be apportioned among Settlement Class Members based on the Settlement Class Member's number of Workweeks. (Bradley Decl., Ex 1, Settlement Agreement at ¶3.6(B)(2) EC Dkt. No. 41.)  This apportionment was subject to a "dollar for dollar" reduction for those class members who received a portion of the $99,972 "Pick-Up Stix" payments.

Pursuant to section 1.11 of the Joint Stipulation of Settlement and Release of Claims, prior payments by Defendant to Class Members will reduce the amount payable to such Class members. As such, prior to the deduction of employee-sided state and federal taxes, the average Individual Settlement Payment is $2,318.21. (Sarich Decl. ¶ 2.)  This average net recovery is exponentially higher than other wage and hour class action settlements approved by California state and federal courts.

### 4.     Releases by the Settlement Class

In exchange for the Class Settlement Amount, Plaintiff and Class Members who do not opt out will agree to release all claims alleged or could have been alleged based on the facts alleged in the operative complaint. The releases in this case are directly related to Plaintiff's claims and are appropriate.

Courts routinely approve releases of claims that were, or likely would have been, denied certification for purposes of litigation.  See *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial"); see also See, e.g., *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 116 & n.308 (S.D.N.Y. 2009)

---

[11] By negotiating the FLSA Check, a Class Member agrees that he or she is opting in, and consenting to, the FLSA Release set forth in Section VII of Class Notice.

(granting preliminary approval of a settlement class that included certain members who had been excluded from the litigation class on grounds of "predominance") (citing *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. at 194-95 (reasoning that the "predominance" and "manageability" concerns under Rule 23(b)(3) were intertwined and because the litigation was no longer going to trial, manageability was no longer an issue, and the "predominance defect [] no longer fatal")); *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 557-58 (N.D. Ga. 2007) (certifying a settlement class in an antitrust case despite noting serious questions about whether a litigation class could be certified; finding "that the fact of settlement is relevant to the decision to certify a class" and that "Courts have, thus, certified classes at the settlement stage noting that such a certification does not present the same problems that certification of a litigation class proposing the same class definition would present").   More generally, the United States Supreme Court has ruled that a court may approve a release of claims that would otherwise fall outside of its traditional jurisdiction.  See *Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367 (1996) (ruling that a state court may approve a settlement of claims that could only have been brought in federal court).

Accordingly, the releases in the Settlement Agreement are narrowly tailored to the claims alleged in the Action, or which could have been alleged in the Action.  See *International Union of Operating Engineers-Employers Canst. Industry Pension, Welfare and Training Trust Funds v. Karr*, 994 F. 2d 1426, 1430 (9th Cir. 1993) ("res judicata bars not only all claims that were actually litigated, but also all claims that 'could have been asserted' in the prior action").

## C.    THE NOTICE AND SETTLEMENT ADMINISTRATION PROCESS WERE COMPLETED PURSUANT TO THE COURT'S ORDER

As authorized by the Court's Order preliminarily approving the Settlement Agreement, the Parties engaged CPT Group to provide settlement administration services.  (Sarich Decl. ¶ 2.) CPT's duties performed to date include, but are not limited to: (a) printing and mailing the Notice of Settlement (hereinafter "Notice Packet") to the Class; (b) performing address updates and verifications as necessary prior to the mailing of the Notice Packet; (c) conducting address traces on those Notice Packets that were returned to CPT as undeliverable; and (d) receiving and processing

and requests for exclusion from and objections to the Settlement. (*Id.*) Duties that CPT will be performed if and after the Court enters a Final Approval Order will include: (a) calculating the Individual Settlement Payments; (b) processing and mailing Individual Settlement Payment checks; (c) handling tax withholdings as required by the Settlement and the law; (d) preparing, issuing and filing tax reporting and other applicable tax forms; (e) handling the distribution of any unclaimed funds pursuant to the terms of the Settlement; and (f) other tasks as the Parties mutually agree to and/or the Court orders CPT to perform. (*Id.*)

On July 9, 2018, CPT received a draft of the Notice Packet from Plaintiff's Counsel, which was formatted and approved by the Parties prior to the mailing (Sarich Decl. ¶ 4.) The Notice of Settlement summarized the Settlement's principal terms, provided Class Members with an estimate of how much they would be paid if the Settlement received final approval, and advised Class Members about how to opt out of the Settlement and how to object.

Separately, CPT received data files from the Defendant containing each Settlement Class Member's name, most recent known mailing address and telephone number, Social Security Number, dates of employment, and prior payment amounts in connection with Releases or unpaid overtime. The mailing list contained three hundred nineteen (319) Settlement Class Members. (Sarich Decl. ¶ 5.) The mailing addresses contained in the Class List were processed and updated using the National Change of Address database maintained by the United States Postal Service. (*Id.* at ¶ 6.)

On August 6, 2018, CPT mailed Notice Packets to Class Members via First Class U.S. Mail. (*Id.* at ¶ 7) Class Members were given until September 5, 2018, to opt out or object to the Settlement. Plaintiff is pleased to report that no individuals opted out of the Settlement and no individuals objected to the Settlement. (*Id.* at ¶¶ 9-10.)

### D.   ARGUMENT

#### 1.   The Standard for Final Approval Has Been Met

A class action may only be settled, dismissed, or compromised with the Court's approval. Fed. R. Civ. Proc. 23(e). The process for court approval of a class action settlement is comprised

12

of three principal stages:

Preliminary Approval:  The proposed settlement agreement is preliminarily reviewed by the Court for fairness, adequacy, and reasonableness.  If the Court believes the settlement falls within the range of reasonableness, such that proceeding to a formal fairness hearing is warranted, it orders notice of the settlement disseminated to the class.  *See* Manual for Complex Litigation § 21.632 (4th ed. 2004).

Class Notice:  Notice of the settlement is disseminated to the class, giving class members an opportunity to object to the settlement's terms or preserve their right to bring an individual action by opting out.  *See id.*, § 21.633.

Final Approval:  A formal fairness or final approval hearing is held by the Court, at which class members can be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement is presented.[12]  Following the hearing, the Court decides whether to approve the settlement and enter a final order and judgment.  *See id.*, § 21.634.

The first two steps have been completed.  The Court has preliminarily reviewed the proposed settlement for fairness and found it to be within the range of reasonableness meriting court approval. (*See* Order Granting Preliminary Approval of Class Settlement, ECF Dkt. No. 51.)  In addition, the Settlement Administrator has notified Class Members of the proposed settlement and upcoming

---

[12] A proposed class action settlement may be approved if the Court, after allowing absent class members an opportunity to be heard, finds that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. Proc. 23(e)(2).  In making this determination, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)); *see also Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ("voluntary conciliation and settlement are the preferred means of dispute resolution.  This is especially true in complex class action litigation . . . .").

1    fairness hearing as directed by the Court.  (*See generally* Sarich Decl.)  Plaintiff now asks the Court

2    to grant final approval of the proposed Settlement.

3          The decision about whether to approve the proposed Settlement is committed to the sound

4    discretion of the trial judge, and will not be overturned except upon a strong showing of a clear

5    abuse of discretion.  *Hanlon*, 150 F.3d at 1026-27.  The Ninth Circuit has set forth a list of non-

6    exclusive factors that a district court should consider in deciding whether to grant final approval,

7    including: (1) the strength of Plaintiffs' case, and the risk, expense, complexity, and likely duration

8    of further litigation; (2) the risk of maintaining class action status throughout the trial; (3) the amount

9    offered in settlement; (4) the extent of discovery completed, and the stage of the proceedings; (5)

10   the experience and views of counsel; and (6) the reaction of the class members to the proposed

11   settlement.  *Id.* at 963 (citing *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993)).

12         These factors, which are discussed below, confirm that the proposed Settlement is more than

13   fair, reasonable, and adequate for Class Members.  The Settlement provides considerable value;

14   Class Members need not bear the risk and delay associated with trial proceedings to obtain these

15   benefits; and the Settlement has been met with substantial support and minimal opposition from

16   Class Members.

17                    **2.      The Settlement Was Achieved After Evaluating the Strengths of**

18                    **Plaintiff's Case and the Risks, Expense, Complexity, and Likely Duration**

19                    **of Further Litigation**

20         In assessing the probability and likelihood of success, "the district court's determination is

21   nothing more than an amalgam of delicate balancing, gross approximations, and rough justice."

22   *Officers for Justice*, 688 F.2d at 625 (internal quotation marks omitted).  There is "no single

23   formula" to be applied, but the court may presume that the parties' counsel and the mediator arrived

24   at a reasonable range of settlement by considering Plaintiffs' likelihood of recovery.  *Rodriguez*,

25   563 F.3d at 965.

26         Throughout this litigation, Defendant has indicated that it intended to vigorously contest

27   class certification and Plaintiff's claims on the merits.  While Plaintiff does not agree with

28

14

Defendant's arguments regarding class certification or their defenses on the merits to Plaintiff's claims, Plaintiff recognizes that there is a risk that the Court and/or a jury will agree with Defendant, and thus, limit or eliminate Class Members' ability to recover on the claims at issue.  A summary of the defenses on the merits that Defendant have asserted to Plaintiff's various claims include, without limitation, the following:

*Plaintiff's Drive Time Claim:*

- Employees were permitted to, and indeed have, driven their personal vehicle to the job sites and were not required to take the company's provided transportation. See e.g. *Overton v. Walt Disney Co.*, 136 Cal.App.4th 263, 271, 38 Cal.Rptr.3d 693 (2006), (finding that the time spent by an employee on an employer-provided shuttle bus from the employer-provided parking lot to the job site was not compensable because employees were not required to use the parking lot or to take the shuttle.); California Labor Code § 510(b), which provides that "[t]ime spent commuting to and from the first place at which an employee's presence is required by the employer shall not be considered to be a part of a day's work, when the employee commutes in a vehicle that is owned, leased, or subsidized by the employer and is used for the purpose of ridesharing."

*Plaintiff's Direct Meal and Rest Break Claim:*

- Defendant's meal and rest break policies comply with California law and breaks were indeed made available to employees.  Defendant argued that the issue of whether the employee chose not to take his or her meal is an individualized issue which would preclude class certification of the meal and rest break issues.

- Employees are required to take compliant meal and rest breaks under Defendant's policies.

*Plaintiff's Wage Statement Claim*

- Even if Plaintiffs could show a technical deficiency in Defendant's pay stubs, they cannot establish any injury stemming from the purported deficiency sufficient to allow recovery under Cal. Lab. Code § 226(e).  See *Milligan v. Am. Airlines, Inc.*, 577 Fed. Appx. 718, 719 (9th Cir. 2014) ("The injury requirement ... cannot be satisfied simply if one of the nine itemized requirements in [§ 226(a)] is missing from a wage statement."); *Holak v. K Mart Corp.,* 2014 U.S. Dist. LEXIS 139879, at *21 (E.D. Cal. Sept. 30, 2014) ("Because Plaintiff did not view her wage statements (even though the injury required to find a violation of California Labor Code section 226 is minimal) the minimal injury requirement is not met.") (internal citation omitted); *Ridgeway v. Wal-Mart Stores, Inc.*, 2014 U.S. Dist. LEXIS 126806, at *28-29 (N.D. Cal. Sept. 10, 2014) ("the statute requires that an employee may not recover for violations of section 226, subdivision (a) unless he or she demonstrates *an injury*

arising from the missing information") (italics in original).

- There is no evidence of a knowing and intentional violation of 226(a). See Cal. Lab. Code § 226(e); *Hurst v. Buczek Enters.*, LLC, 870 F. Supp. 2d 810, 829 (N.D. Cal. May 2, 2012) (finding that failure to provide compliant wage statements was not knowing and intentional and granting summary judgment on wage statement claim); *Reber v. Aimco/Bethesda Holdings, Inc.*, 2008 U.S. Dist. LEXIS 81790, at *25 (C.D. Cal. August 25, 2008) (same)

**Plaintiff's Separation Pay Claim**

- To the extent this claim is alleged as a derivative claim, it fails for the same reasons as the underlying claims.

- This claim fails because even if Plaintiff's or Class Members were not paid all amounts owed at separation (which Defendant vehemently denies), there was a good faith dispute as to whether additional wages are owed and Plaintiff cannot show that any such alleged underpayment was "willful" so as to justify the payment of penalties under California Labor Code section 203. *See* Cal. Lab. Code § 203(a) (requiring a "willful" violation to assert liability);

Furthermore, while Defendant has agreed to request certification for settlement purposes only, if the Settlement is not approved, Defendant has indicated that it intends to vigorously contest certification, which creates further risk for Class Members. See, e.g., *Ogiamien v. Nordstrom, Inc.*, 2015 U.S. Dist. LEXIS 22128, at *15; 165 Lab. Cas. (CCH) P36, 317 (C.D. Cal. February 24, 2015) (denying certification of bag check case); *Quinlan v. Macy's Corp. Servs., Inc.,* 2013 U.S. Dist. LEXIS 164724 (C.D. Cal. 2013) (same); *Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611 (S.D. Cal. 2014) (granting motion for decertification of closing time claim); *Holak*, 2014 U.S. Dist. LEXIS 139879, at *21-22 (denying certification of direct wage statement claim); *Ridgeway*, 2014 U.S. Dist. LEXIS 126806, at *28-29 (granting summary judgment and denying certification of direct wage statement claim).

Although Plaintiff believes he had valid counter-arguments to the defenses, and was cautiously optimistic about his chances of prevailing at trial, this optimism was tempered by the recognition that the odds of a favorable verdict being reversed on appeal are not too remote to ignore. *W. Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970) ("[i]t is known from past experience that no matter how confident one may be of the outcome of litigation, such

16

1    confidence is often misplaced"), *aff'd*, 440 F.2d 1079 (2d Cir. 1971); *Berkey Photo, Inc. v. Eastman*

2    *Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial); *Trans World*

3    *Airlines, Inc. v. Hughes*, 312 F. Supp. 478 (S.D.N.Y. 1970), modified, 449 F.2d 51 (2d Cir. 1971),

4    *rev'd*, 409 U.S. 363 (1973) (overturning $145 million judgment after years of appeals).

5        Additionally, early resolutions save time and money that would otherwise go to litigation.

6    Parties' resources, as well as the Court's, would be further taxed by continued litigation.  And if this

7    action had settled following additional litigation, the settlement amount would likely have taken into

8    account the additional costs incurred, such that there may have been less available for Class

9    Members.  Cost savings is one reason why California policy strongly favors early settlement.  *See*

10   *Neary v. Regents of Univ. of Cal.*, 3 Cal. 4th 273, 277 (1992) (explaining the high value placed on

11   settlements and observing that "[s]ettlement is perhaps most efficient the earlier the settlement

12   comes in the litigation continuum.").  This concern also supports settlement.

13       In summary, although Plaintiff and his counsel maintained a strong belief in the underlying

14   merits of the claims, they also acknowledge the significant challenges posed by continued litigation

15   through trial.  Accordingly, when balanced against the risk and expense of continued litigation, the

16   settlement is fair, adequate, and reasonable.  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242

17   (9th Cir. 1998) ("the very essence of a settlement is compromise, a yielding of absolutes and an

18   abandoning of highest hopes").

19                  **3.      The Settlement Was Reached through Arm's-Length Bargaining in**

20                  **which All Parties were Represented by Experienced Counsel**

21       The Parties participated in a full-day mediation session with Mark Rudy, a well-respected mediator

22   of wage and hour class actions.  Mr. Rudy helped to manage the Parties' expectations and provided a useful,

23   neutral analysis of the issues and risks to both sides.  A mediator's participation weighs considerably against

24   any inference of a collusive settlement.  *See  In re Apple Computer, Inc. Derivative Litig.*, No. C 06-4128 JF

25   (HRL), 2008 U.S. Dist. LEXIS 108195 (N.D. Cal. Nov. 5, 2008); *D'Amato v. Deutsche Bank*, 236 F.3d 78,

26   85 (2d Cir. 2001) (a "mediator's involvement in pre-certification settlement negotiations helps to ensure that

27   the proceedings were free of collusion and undue pressure.")  At all times, the Parties' negotiations were

28

adversarial and non-collusive.

The Parties were represented by experienced class action counsel throughout the negotiations resulting in this Settlement.  Plaintiff was represented by Bradley/Grombacher LLP, a firm that regularly litigate wage and hour claims through certification and on the merits, and have considerable experience settling wage and hour class actions.  (*See generally* Bradley Decl.)  Defendant was represented by Nassiri & Jung LLP which operates a respected class action defense practice.

As this Settlement is the "result of arms'-length negotiations by experienced class counsel, [it is] entitled to 'an initial presumption of fairness.'" *Volkswage*n, 2016 WL 4010049, at *14 (internal citation omitted).

### 4.    Class Counsel Conducted A Thorough Investigation of the Factual and Legal Issues

Furthermore, the Settlement is the product of informed negotiations following extensive investigation by Plaintiff's Counsel.  During this matter's pendency, the Parties thoroughly investigated and researched the claims in controversy, their defenses, and the developing body of law.  The investigation entailed the exchange of information pursuant to formal and informal discovery methods, including interrogatories and requests for admission, and dozens of depositions.  In the course of written discovery, Class Counsel received and analyzed documents, *inter alia*, the following information and evidence with which to properly investigate and evaluate the claims, including: (1) Defendant's written policies regarding, e.g., meal and rest period policies, time-keeping, final pay, overtime; (2) wage statements; and (3) time and payroll records.  Apart from written discovery, Class Counsel also interviewed members of the Class regarding their experiences working for Defendant.

Overall, Class Counsel performed an exhaustive investigation into the claims at issue, which included: (1) determining Plaintiff's suitability as putative class representative through interviews, background investigation, and analysis of his employment files and related records; (2) evaluating all of Plaintiff's potential claims; (3) researching similar wage and hour class actions as to the claims brought, the nature of the positions, and the type of employer; (4) analyzing Defendant's labor policies and practices; (5)

18

researching settlements in similar cases; (6) conducting a discounted valuation analysis of claims; (7) drafting the mediation brief; (8) participating in a full-day mediation session; and (9) finalizing the Settlement Agreement.  The extensive document and data exchanges have allowed Class Counsel to appreciate the strengths and weaknesses of the claims alleged against the benefits of the proposed Settlement.

### 5.    The Class Has Responded Positively to the Settlement

The Settlement Class' response demonstrates its support for this Settlement—0% of Class Members opted out and 0% Class Members filed documents drafted as objections to the Settlement. (Sarich Decl. ¶¶ 9-10.)  Participating Class Members will share the entire Net Distribution Fund and will receive an average payment of $2,318.21, with the highest being $17,556.44.  (*Id.* at ¶ 12.)  A low number of opt-outs and objections is a strong indicator that a settlement is fair and reasonable. *See, e.g.*, *Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) (affirming settlement approval where 45 of approximately 90,000 notified class members objected and 500 opted out); *7-Eleven Owners for Fair Franchising v. Southland Corp.*, 85 Cal. App. 4th 1135, 1152-53 (2000) (class response favorable where "[a] mere 80 of the 5,454 national class members elected to opt out [(1.5% of the entire Class)] and . . . [a] total of nine members . . . objected to the settlement).  The Class Members' response—both in the extremely low rate of opt-outs and objectors—compares favorably to those cases and warrants final approval.

Likewise, the average Class Member recovery of $ $2,318.21 compares very favorably to other wage and hour class action settlements for similar claims on behalf of non-exempt employees. *See, e.g.*, *Palencia v. 99 Cents Only Stores*, No. 34-2010-00079619 (Sacramento County Super. Ct.) (average net recovery of approximately $80); *Fukuchi v. Pizza Hut*, Case No. BC302589 (L.A. County Super. Ct.) (average net recovery of approximately $120); *Contreras v. United Food Group, LLC*, Case No. BC389253 (L.A. County Super. Ct.) (average net recovery of approximately $120); *Ressler v. Federated Dep't Stores, Inc.*, Case No. BC335018 (L.A. County Super. Ct.) (average net recovery of approximately $90); *Doty v. Costco Wholesale Corp.*, Case No. CV05-3241 FMC-JWJx (C.D. Cal. May 14, 2007) (average net recovery of approximately $65); *Sorenson v. PetSmart, Inc.*, Case No. 2:06-CV-02674-JAM-DAD (E.D. Cal.) (average net recovery of approximately $60); *Lim*

19

*v. Victoria's Secret Stores, Inc.*, Case No. 04CC00213 (Orange County Super. Ct.) (average net recovery of approximately $35); *Gomez v. Amadeus Salon, Inc.*, Case No. BC392297 (L.A. Super. Ct.) (average net recovery of approximately $20).

### 6.    The Proposed PAGA Settlement Is Reasonable

Pursuant to the Settlement Agreement, $10,000 from the Total Settlement Amount shall be allocated to the resolution of the PAGA claim, of which 75% ($7,500) will be paid directly to the LWDA, and the remaining 25% will be added to the Net Distribution Fund. This result was reached after good-faith negotiation between the Parties. Where PAGA penalties are negotiated in good faith and "there is no indication that [the] amount was the result of self-interest at the expense of other Class Members," such amounts are generally considered reasonable. *Hopson v. Hanesbrands Inc.*, Case No. 08-00844, 2009 U.S. Dist. LEXIS 33900, at *24 (N.D. Cal. Apr. 3, 2009); *see also Nordstrom Com. Cases*, 186 Cal. App. 4th 576, 579 (2010) ("[T]rial court did not abuse its discretion in approving a settlement which does not allocate any damages to the PAGA claims.").

The PAGA component of the Settlement is the product of arm's-length negotiations between counsel well versed in the intricacies of PAGA litigation and, more importantly, wage and hour employment law. Class Counsel conducted extensive formal and informal investigation and discovery into the claims at issue and have assessed both the strengths and weaknesses of the claims and the risks of continued litigation. Based on the preceding, Class Counsel strongly believe that the PAGA component of the Settlement appropriately reflects the relative strengths of the Parties' respective claims and defenses, as well as the substantial risks presented in continuing the litigation.

### 7.    The Requested Payment to the Settlement Administrator Is Reasonable and Should Receive Final Approval

Plaintiff requests final approval of Settlement Administration Costs in the amount of $18,000. (Sarich Decl. ¶15.) CPT has promptly and properly distributed the Notice of Settlement to all Class Members and completed its duties in accordance with the Settlement terms and the Court's preliminary approval order. (*See generally* Sarich Decl.) Accordingly, the $18,000

payment is fair and reasonable and should be accorded final approval along with the rest of the Settlement terms.

### E.  CONCLUSION

The Parties have negotiated a fair, reasonable, and adequate settlement of a case that provides relief that likely would never have been realized but for this class action.  Accordingly, final approval of the Settlement should be granted.

Dated:  October 2, 2018                    BRADLEY/GROMBACHER LLP


                                   BY:  ___/S/ Marcus J. Bradley
                                        Marcus J. Bradley, Esq.
                                        Attorneys for Plaintiff,

                                        JAMES OUTLEY, II

21